

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

FILED
MAR 2 6 2014
CLERK

| | | |
|---|---|---|
| MICHAEL L. BALES, | * | CIV 13-4021-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | REVERSING AND |
| CAROLYN W. COLVIN, Acting | * | REMANDING THE |
| Commissioner of Social Security, | * | COMMISSIONER'S DECISION |
| | * | |
| Defendant. | * | |

Plaintiff Michael L. Bales (Bales) seeks reversal of the Commissioner of Social Security's decision denying Bales's application for Social Security Disability Insurance (SSDI) benefits. Alternatively, Bales requests that this Court remand the case for a further hearing on issues he has raised.[1]   For the reasons explained below, this Court reverses and remands the Commissioner's decision for further consideration.

## I.   Procedural Background

On June 5, 2009, Bales filed an application for SSDI benefits under Title II of the Social Security Act alleging disability since January 20, 2008, due to degenerative disc disease, depression, memory and concentration problems, and post-laminectomy syndrome. AR[2] 17, 182, 210.  Bales later alleged that the side effects of his medications further contributed to his

---

[1]Bales entitled his appeal a "Motion for Summary Judgment." Doc. 11.  Under the Standing Order of this Court filed on December 5, 2000, summary judgment is not the means for disposition of Social Security appeals in this district.  Rather, once a plaintiff files a complaint and the defendant files an answer in a Social Security matter, the court enters an order setting a briefing schedule and thereafter makes a determination concerning the Commissioner's decision.  This Court entered such a briefing schedule, Doc. 8, and Bales's appeal is ripe for decision by this Court.

[2]Citations to the appeal record will be cited as "AR" followed by the page or page numbers.

disability. AR 78. The Social Security Administration denied Bales's application initially on November 23, 2009, and again upon reconsideration on April 5, 2010. AR 17, 69, 72, 76. In late April 2010, Bales requested a hearing before an Administrative Law Judge (ALJ). AR 78. The ALJ conducted a hearing, AR 37, and issued a decision in November of 2011 finding that Bales was not disabled and thus was not entitled to benefits. AR 17-30. Bales then requested that the Appeals Council review the ALJ's decision and submitted new evidence. The Appeals Council considered the new evidence but denied Bales's request for review, thus making the ALJ's opinion the final decision of the Commissioner. AR 1-6.

## II.   Factual Background

Bales was born on October 24, 1961. AR 44, 182. He attended high school through his junior year and later earned a GED. AR 44. Bales managed a television and appliance store from 1987 until approximately 2001 when he began working as a sales representative at a radio station. AR 45-46, 221. The radio station eventually let Bales go, AR 47, whereafter he became general manager at a boat dealership in late 2002. AR 211.

On January 12, 2006, Bales injured his back at work while clearing chunks of ice from a boat cover. AR 51, 292, 418. An MRI taken the next day showed disk herniations, advanced degenerative disc disease, and spondylosis at levels L4-L5 and L5-S1 of Bales's spine. AR 419, 505. At a March 3, 2006 appointment with Dr. Mikel Holland, Bales reported back pain with radiation to the left hip and leg, changes in bowel habits, urination difficulty, and some erectile dysfunction. AR 418. Dr. Holland noted that Bales had undergone a microdiscectomy at L4-L5 eight years ago and remarked that it was unlikely that simple non-operative treatment would resolve Bales's problems. AR 418-19. An April 4, 2006 back surgery performed by Dr. Edward

2

Seljeskog resulted in a complete resolution of Bales's pain. AR 292, 300.[3] By January 2007, however, Bales's pain had returned. AR 292, 300. Dr. Seljeskog diagnosed Bales with a recurrent disc herniation at L4-L5 on February 2, 2007. AR 311. An MRI taken that day showed encasement of the left L5 nerve root, disc herniation at L4-L5, and disc degeneration with severe loss of disc height at L5-S1. AR 296.

Bales's workers' compensation case manager referred him to Dr. Rand Schleusener for a second opinion on his back. AR 292. At a March 15, 2007 appointment, Bales reported to Dr. Schleusener that his back pain was making him quite miserable, but denied any pain, numbness, tingling, or weakness in his legs. AR 292. On examination, Bales had full range of motion in his lumbar spine, and his lower extremities showed normal motor strength and a full range of motion without any pain or limitations. AR 292. Dr. Schleusener agreed that Bales had a recurrent disc herniation at L4-L5 and stated that another surgery was a reasonable option. AR 292.

Bales saw Dr. Holland on March 26, 2007, for a renewal of his Effexor[4] prescription. AR 420. Bales reported trouble sleeping and Dr. Holland assessed him as having insomnia. AR 420. Bales saw Dr. Seljeskog for a followup on April 27, 2007, during which he complained of back and radicular leg pain. AR 309. Dr. Seljeskog recommended surgery, stating that "[w]e will plan to be fairly aggressive with our disc removal." AR 309. On May 2, 2007, Dr. Seljeskog

---

[3]Although Bales's April 4, 2006 back surgery and the related treatment notes are absent from the administrative record, this surgery is discussed in other medical records, AR 292, 300, and both parties agree that the surgery took place. Doc. 12 at 5; Doc. 18 at 2.

[4]Effexor is an antidepressant used to treat major depressive disorder, anxiety, and panic disorder. See Drugs.com, Effexor, http://www.drugs.com/effexor.html (last visited March 18, 2014).

3

performed a bilateral L4-L5 hemilaminectomy and discectomy on Bales. AR 307. At a post-operative follow-up appointment on May 22, 2007, Bales reported that he still had pain in his right leg and Dr. Seljeskog noted that Bales had a foot drop when he walked on his heels. AR 306. Bales saw Dr. Seljeskog again on June 1, 2007. AR 305. Although Bales complained of continued back pain and radicular symptoms on the left, Dr. Seljeskog noted that Bales "move[d] about quite readily" and appeared to be "quite comfortable." AR 305. An MRI from that day showed a centrally protruding disc at L4-L5, which Dr. Seljeskog felt "could be affecting either the right or the left traversing nerve roots." AR 294, 305. Dr. Seljeskog further noted that the MRI showed "a lot of reactive change in the adjacent vertebral body. There is a tiny L5-S1 central disc protrusion." AR 305. Dr. Seljeskog released Bales to light duty work. AR 305.

A physical therapy progress report from July 12, 2007, described Bales as generally having five out of ten pain and being unable to tolerate prolonged standing, but as having made good gains in flexibility and mobility. AR 298. Bales was seen at Dr. Seljeskog's clinic the next day and was noted to have improved from his last appointment. AR 304. Bales had been working one to two hours a day and was told that he could work more if it was tolerable. AR 304. Bales was also allowed to increase the fifteen to twenty pounds he was already lifting if he could tolerate it. AR 304. Bales did report, however, that sitting or standing for any length of time was difficult for him. AR 304.

Bales's workers' compensation case manager referred him to another surgeon, Dr. Daniel G. Tynan, on July 24, 2007. AR 300-02. An examination revealed that Bales had "slight difficulty" walking on his right heel because of "mild foot drop[,]" minimal weakness in the right foot, and a mildly positive straight leg raise bilaterally, causing both back and leg pain. AR 301.

Dr. Tynan remarked that Bales's most recent MRI showed severe degenerative disk disease at levels L4-L5 and L5-S1, but did not find any significant disc herniations. AR 301. Dr. Tynan opined that given these "significant degenerative changes" and Bales's multiple back surgeries "it is not surprising that he has some chronic low back pain." AR 302. Dr. Tynan told Bales his options were to redo conservative treatment, simply live with the pain, or consider lumbar fusion surgery. AR 301-02. Dr. Tynan explained that the fusion surgery would be "an attempt to improve [Bales's] back pain so that he can return to work duty and not to be chronically disabled." AR 302.

In an August 9, 2007 letter to Bales's workers' compensation case manager, Dr. Seljeskog opined that Bales had reached maximum medical improvement and stated that he did not anticipate the need for any further surgical intervention. AR 303. At an appointment the next day, Dr. Holland discussed Bales's back treatment options with him and assessed Bales as having, among other things, depression and nicotine dependence. AR 422-23.

On referral from his workers' compensation insurer, Bales then saw Dr. Jerry Blow, a physiatrist, on September 24, 2007. AR 342. Bales reported constant pain in his low back and an intermittent sharp, burning pain in his right leg aggravated by walking, sitting, standing, driving, lifting, bending, twisting, and climbing steps. AR 343. Bales stated that he worked one to two hours two days a week and four to five hours three days a week. AR 344. He described his job as involving lifting, bending, twisting, reaching, driving, writing, typing, filing, walking, sitting, standing, mechanic work, and sweeping. AR 345. Dr. Blow recommended facet block injections, physical therapy, no lifting over fifteen pounds, no bending, twisting, or squatting,

avoiding awkward positions, and working no longer than three hours a day, six days a week. AR 346.

Dr. Heloise Westbrook administered a nerve block and steroid injection to Bales's back on October 5, 2007. AR 413-16. Her exam revealed that Bales had no difficulty ambulating and walking on his toes and heels, five out of five strength in his lower extremities, and a positive Waddell sign for rotation. AR 416. Bales did have a positive straight leg raise bilaterally, decreased hip flexion, and tenderness along his lower lumbar region, however. AR 416.

Bales saw Dr. Blow again on October 22, 2007. AR 338. Bales reported that the injections seemed to make his back pain worse and that he had some good days and some bad days at work. AR 338. Dr. Blow started Bales on Cymbalta,[5] recommended that he continue taking Celebrex[6] and Tizanidine,[7] and prescribed physical therapy. AR 339. He also recommended that Bales increase the amount of time he spent at work each day by one hour each week until Bales saw him again. AR 339. Bales had a follow-up appointment with Dr. Blow on November 12, 2007. AR 335. Although Bales reported significant back pain, he had increased his work hours per Dr. Blow's instructions and had even worked three nine-hour days. AR 335. Other than walking in a somewhat guarded manner, Bales's gait was normal, and he

---

[5]Cymbalta is an antidepressant used to treat depression, anxiety, fibromyalgia, and chronic muscle or joint pain. See Drugs.com, Cymbalta, http://www.drugs.com/cymbalta.html (last visited March 18, 2014).

[6]Celebrex is a nonsterodial anti-inflammatory used to treat pain or inflamation. See Drugs.com, Celebrex, http://www.drugs.com/celebrex.html (last visited March 18, 2014).

[7]Tizanidine is a muscle relaxant used to relieve spasms and increased muscle tone caused by multiple sclerosis, stroke, or brain or spinal injury. MedlinePlus, U.S. National Library of Medicine, National Institutes of health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601121.html (last visited March 18, 2014).

could heel-and-toe walk with ease. AR 336. A straight leg raise done that day was negative. AR 336. Dr. Blow took Bales off Cymbalta and started him on Lyrica.[8]  AR 336. He also told Bales to cut his work hours back to five hours a day for one week before going to six hours a day for three weeks. AR 336. Bales had a phone conference with Dr. Blow on November 27, 2007. AR 333. Bales reported that he was no longer having constant leg and back pain and that he was working six hours a day. AR 333. Dr. Blow's impression was that Bales's overall condition had improved with therapy and medications. AR 333.

At a December 11, 2007 appointment with Dr. Blow, Bales reported an increase in pain and having trouble sleeping. AR 331. Although Bales's lumbar range of motion was limited, his straight leg raise was negative. AR 331-32. Dr. Blow's impression was that Bales was approaching maximum medical improvement. AR 332. He stated that Bales could work up to seven hours a day and ordered a functional capacity evaluation (FCE). AR 332.

Nano Johnson, a physical therapist (PT), conducted an FCE for Bales on January 2, 2008. AR 519-22. In a letter to Dr. Blow, PT Johnson stated that the FCE indicated that Bales was "able to work at the LIGHT Physical Demand Level for an 8-hour day according to the Dictionary of Occupational Titles, U.S. Department of Labor, 1991." AR 519. PT Johnson reported further that Bales had not shown any symptom or disability exaggeration behavior during the FCE. AR 519. The FCE form listed particular work activities and provided corresponding blanks for the evaluator to identify the weight limit at which the patient could perform the activity and whether the patient could do so infrequently, occasionally, frequently,

---

[8]Lyrica, or pregabalin, is used to treat, among other things, neuropathic pain associated with spinal cord injury. See Drugs.com, Lyrica, http://www.drugs.com/lyrica.html (last visited March 18, 2014).

or constantly. AR 521. PT Johnson found that Bales could not power lift or back lift any weight, even infrequently; could lift twenty pounds occasionally and twenty-five pounds infrequently using a leg lift; could shoulder lift and overhead lift fifteen pounds occasionally; could occasionally two-hand carry fifteen pounds and one-hand carry ten pounds; could walking push/pull twenty-five pounds occasionally and thirty pounds infrequently; and could standing push/pull thirty-five to fifty-five pounds occasionally and forty to sixty pounds infrequently. AR 521. The FCE form as completed by PT Johnson indicated that Bales could not lift, carry, or push or pull any weight frequently. AR 521. In terms of posture, PT Johnson found that Bales could squat and kneel occasionally and bend only infrequently. AR 521. Finally, PT Johnson found that Bales could sit constantly; could stand, walk, and forward reach frequently; and could overhead reach occasionally. AR 521.

When Bales had a phone conference with Dr. Blow on January 15, 2008, he was in "quite a bit of pain" and reported needing to increase his hydrocodone[9] intake to cope with working seven hours a day. AR 328. Bales also stated that his boss at the boat dealership had recently told him that the dealership was no longer able to accommodate his work restrictions. AR 328. Dr. Blow noted that Bales had recently undergone an FCE and that Bales said he was sore for two or three days afterwards. AR 328. According to Dr. Blow, the FCE revealed that Bales could work in a light duty capacity: Bales could bend and crawl infrequently; squat, kneel, and reach overhead occasionally; sit constantly; stand, walk, and forward reach frequently; lift twenty pounds occasionally and twenty-five pounds infrequently using a leg lift; shoulder lift fifteen

---

[9]Hydrocodone is a narcotic pain reliever. See Drugs.com, Hydrocodone and Acetaminophen, http://www.drugs.com/hydrocodone.html (last visited March 19, 2014).

pounds occasionally to infrequently; one-handed carry ten pounds occasionally; walking push/pull twenty-five pounds occasionally and thirty pounds infrequently; and standing push/pull thirty-five to fifty-five pounds occasionally and forty to sixty pounds infrequently. AR 328-329. Dr. Blow wrote that the FCE revealed that Bales did not demonstrate any symptoms of disability exaggeration.  AR 329.  Dr. Blow recommended that Bales continue taking Lyrica and Tizanidine, wean off hydrocodone, and released Bales to work under the guidelines of the FCE. AR 330.

On January 31, 2008, Bales saw Dr. Holland to discuss his medications and mood.  AR 426. Bales reported feeling depressed, frustrated, and anxious, and discussed committing suicide by crashing his car. AR 426. Dr. Holland referred Bales to the emergency room for a mental health assessment that day.  AR 427.  The mental health staff arranged for Bales to see Dr. Westbrook for pain management, Dr. Ulises Pesce, a psychiatrist, for adjustments of his medications, and a counselor. AR 427.

Bales saw Dr. Westbrook on February 2, 2008.  AR 412.  Bales reported pain in his back that occasionally radiated down his leg.  AR 412.  On examination, Bales had five out of five strength in his lower extremities.  AR 412.  Dr. Westbrook took Bales off hydrocodone and started him on oxycodone[10] extended release.  AR 412.

Bales visited Dr. Pesce on February 6, 2008, for his depression.  AR 355.  On examination, Bales showed no memory deficits or difficulties with abstract thinking, and his attention, concentration, insight, and judgment were good. AR 356. Dr. Pesce diagnosed Bales

---

[10]Oxycodone is opioid medication used to treat moderate to severe pain.  See Drugs.com, Oxycodone, http://www.drugs.com/oxycodone.html (last visited March 19, 2014).

with "[m]ajor depressive disorder, single episode, without psychosis, severe." AR 356. Dr. Pesce gave Bales a Global Assessment of Functioning (GAF)[11] score of fifty-five and recommended that he increase his dosage of Lyrica and Effexor. AR 356-57. Bales saw Therapist Jodi Owen on February 12, 2008, to discuss his depression and pain issues. AR 394.

Bales returned to Dr. Westbrook on February 29, 2008, complaining of continuing back pain. AR 411. Dr. Westbrook decreased Bales's Celebrex and Lyrica and replaced his oxycodone with Kadian.[12] AR 411.

Dr. Pesce reevaluated Bales on March 12, 2008. AR 388. Bales described not noticing much improvement and experiencing depression and angry outbursts. AR 388. Dr. Pesce wrote that Bales's depression "seems to be quite severe" and that Bales "has a lot of problems with intermittent explosive type of reactions." AR 388. Dr. Pesce started Bales on Trileptal in addition to his Effexor. AR 388.

Bales returned to Dr. Westbrook on March 28, 2008. AR 410. He stated that his back pain made it difficult to sleep and that he was only getting fair to poor relief from the morphine and pregabalin. AR 410. Dr. Westbrook recommended that Bales continue taking these two medications and that he repeat the FCE because "the initial evaluation was done over a very brief time and may not necessarily reflect [Bales's] functional capacity." AR 410. Dr. Westbrook

---

[11]"The GAF is a numerical assessment between zero and 100 that reflects a mental health examiner's judgment of the individual's social, occupational, and psychological function." Hurd v. Astrue, 621 F.3d 734, 736 (8th Cir. 2010).

[12]"Kadian (morphine) is an opioid pain medication . . . . used to treat moderate to severe pain." Drugs.com, Kadian, http://www.drugs.com/kadian.html (last visited March 19, 2014).

proposed a "two-day functional capacity evaluation as this could more accurately assess [Bales's] functional capacity." AR 410.

Bales saw Therapist Owen on May 1, 2008. AR 384. By that point, he had seen her on several occasions to discuss his depression and how to adjust to the limiting effects of his back pain. AR 385, 386, 387, 390-91, 392. Bales reported that he was thinking about applying for disability. AR 384. Bales visited Dr. Pesce for a medication check on May 12, 2008, during which Bales reported being "slightly better" at controlling his explosive reactions. AR 382. After seeing Bales in early June 2008, Dr. Pesce wrote that Bales seemed "to be stable at this point, is not having any new complaints." AR 380.

On June 3, 2008, Bales saw Dr. Westbrook for a reevaluation. AR 349. Dr. Westbrook recommended, among other things, that Bales "exercise for strengthening and conditioning of his lower back daily." AR 349. She remarked that Bales might be a "candidate for spinal cord stimulation therapy as [he] remains with intractable pain and the research has shown spinal cord stimulation therapy can optimize his pain control." AR 349.

Bales visited Dr. Blow on June 24, 2008, for an evaluation concerning whether he needed further treatment and a new FCE. AR 322. Bales described significant back pain with activity and said that he had to stop five times on the three-hour drive to see Dr. Blow. AR 322. Nevertheless, Bales stated that his daily activities included showering, dressing, cleaning the house, and preparing meals. AR 326. On examination, Bales's straight leg raise was "excellent," with Dr. Blow noting that Bales "held his leg extended for a considerable length of time which was surprising for someone with his degree of low back pain." AR 327. Bales's lumbar flexion was thirty-five degrees, his extension was "better," and his side bending and rotation were good.

11

AR 327. Dr. Blow noted that Bales moved "about the room very easily,"and that Bales did not demonstrate any "pain behavior" while doing his exercises that day. AR 327. Dr. Blow concluded that Bales's FCE from January 2, 2008 was "still valid and can be used for vocational planning." AR 327. He further found that a spinal cord stimulator was unnecessary given Bales's "great mobility and ability to hold a straight leg raise without coaxing today[.]" AR 327.

Bales revisited Dr. Westbrook on July 7, 2008. AR 348. Dr. Westbrook wrote that despite Bales's surgeries, medications, and injection therapy, Bales continued to "experience unrelenting intractable lower back pain." AR 348. Dr. Westbrook recommended a trial of spinal cord stimulation for Bales's pain. AR 348. Bales saw Dr. Pesce on July 15, 2008 for a medication check. AR 376. Dr. Pesce noted that Bales "seems to be doing quite well" and scheduled him for a followup in three months. AR 376.

Rick Ostrander, a vocational rehabilitation counselor hired by Bales's attorney, completed a vocational evaluation in early August 2008 in connection with Bales's work injury. AR 523-531. Ostrander reviewed Bales's FCE and noted that although the FCE placed Bales in the light category of physical exertion, the specific results of the FCE "essentially represent[ed] a restricted range of light duty work." AR 528. Ostrander ultimately concluded that Bales was "essentially limited to light duty work." AR 530. A few days later, Ostrander sent Dr. Westbrook a letter detailing what he believed were some additional limitations Bales may have had and asking Dr. Westbrook whether she agreed. AR 506.

Bales continued to see Dr. Westbrook for pain management over the next few months. At an August 7, 2008 appointment, Dr. Westbrook encouraged Bales to do strengthening and conditioning exercises for his lower back "as tolerated" and continued him on his medications.

12

AR 409. During a September 11, 2008 appointment, Dr. Westbrook recommended again that Bales try spinal cord stimulation, but noted that they would need to wait for Bales's workers' compensation insurance to approve the procedure. AR 407-08. On September 29, 2008, Dr. Westbrook responded to Ostrander's letter and indicated that she agreed with Ostrander's statement that Bales had chronic pain that varied unpredictably in intensity, that when Bales had a bad day he would be unable to function at the level identified in the FCE, and that Bales's pain and medication side effects made him unproductive and ineffective in his job at the boat dealership. AR 506.

At an October 14, 2008 appointment with Dr. Pesce, Bales reported having little trouble with his emotions and experiencing no depression. AR 372. Bales also stated that he was "managing his back pain much better." AR 372. At a November 6, 2008 appointment with Dr. Westbrook, however, Bales rated his pain as eight out of ten, and Dr. Westbrook wrote that Bales was in "excruciating pain." AR 406. When Bales saw Dr. Pesce approximately a week later, he stated that although he was in a lot of pain that day, things in general were "much better for him." AR 370. Bales further reported that the management of his pain "seems to be working better." AR 370.

In a November 2008 letter to Bales's attorney, Ostrander stated that although the FCE and Dr. Blows's opinion placed Bales in a "restricted range of light duty work[,]" Dr. Westbrook had confirmed that Bales suffered additional limitations. AR 350. Ostrander believed that these additional limitations would preclude Bales from functioning productively at work and make vocational rehabilitation futile. AR 350.

13

When Bales saw Dr. Westbrook again on December 4, 2008, he rated his pain as eight out of ten. AR 405. Dr. Westbrook's impression was that Bales had post-laminectomy syndrome and she continued him on Kadian. AR 405. When Bales saw Dr. Pesce for a medication check on December 17, 2008, Dr. Pesce noted that Bales seemed to be "experiencing a lot of pain" and that Bales was frustrated by this. AR 368. Bales reported continued back pain and feeling discouraged when he saw Dr. Pesce for a recheck on January 21, 2009. AR 366. At an appointment with Dr. Westbrook the next day, Bales described his pain as a burning, stabbing sensation that radiated to both legs and made sleeping difficult. AR 404. Bales had similar appointments with Dr. Pesce and Dr. Westbrook in March 2009, reporting back pain that radiated to his legs, AR 402, and feeling discouraged, AR 364.

After seeing Bales on April 21, 2009, Dr. Pesce wrote that Bales was doing "fairly well[,]" but that his back pain was still "a serious problem." AR 362. In her notes from an April 23, 2009 appointment with Bales, Dr. Westbrook remarked that Bales "paces his activity and is able to attend [to] his activities of daily living with minimal interference. Excessive activity incapacitate [sic] the patient." AR 401.

Bales rated his pain level as seven out of ten at a May 2009 appointment with Dr. Westbrook, and Dr. Westbrook continued Bales on Kadian. AR 400. When Bales saw Dr. Pesce for a June 2, 2009 appointment, Dr. Pesce remarked that Bales was doing "quite well" and noted that Bales wished to cut down on his medications. AR 360. Bales however reported continued back pain to Dr. Westbrook on June 25, 2009, again rating it as a seven out of ten. AR 486.

Bales saw Dr. Pesce for a medication check July 14, 2009. AR 358. Bales reported going camping with his family and enjoying it "very much." AR 358. He also said that he was

14

tolerating the reduction in his Trileptal and that he would like to discontinue it. AR. 358. Dr. Pesce noted that Bales seemed to be "doing well." AR 358. When Bales saw Dr. Westbrook on July 17, 2009, he requested a "letter regarding his disability for continued credit disability insurance." AR 398. Although Dr. Westbrook noted that Bales was able to complete his activities of daily living with minimal interference from his pain, she stated that Bales was "unable to work due to his low back pain despite having surgery. [Bales] still remains disabled." AR 398.

Bales had a followup with Dr. Pesce on August 11, 2009. AR 453. Bales had stopped taking Trileptal, and Dr. Pesce did not see any problems with Bales's mental status. AR 453. Dr. Pesce noted that although Bales still had "a lot of problems" with his pain, he was managing it "quite well with the help of the pain specialist." AR 453. Bales saw Therapist Owen that same day. AR 459. Bales reported that he was "doing a little better overall" and that he had lowered his pain medication. AR 459. Bales saw Dr. Westbrook three days later for back pain that radiated down his left leg. AR 399. Dr. Westbrook wrote that Bales "still has intractable pain which is very debilitating." AR 399. She recommended that Bales exercise for strengthening and conditioning of his lower back and continue taking Kadian. AR 399. Bales repeated his complaint of back pain that radiated to his legs at an appointment with Dr. Westbrook on October 1, 2009. AR 512.

In connection with Bales's application for disability insurance benefits, Dr. Doug Soule, a non-examining state agency physician, completed a Psychiatric Review Technique (PRT) form for Bales on October 29, 2009. AR 431. Dr. Soule found that Bales had a medically determinable impairment of major depression that was not severe with coexisting nonmental

15

impairments. AR 431, 434. Dr. Soule determined that Bales had experienced one or two episodes of decompensation and that Bales's depression would result in mild limitations in his activities of daily living, social functioning, and his ability to maintain concentration, persistence, or pace. AR 441. In the "consultant's notes" section of the PRT form, Dr. Soule noted that Bales had alleged limitations resulting only from his back pain, rather than from his depression, in his initial function report. AR 443. After discussing some of the medical records from Bales's appointments with Dr. Pesce, Dr. Soule concluded that although Bales still had issues with back pain, the medical records "indicate that from a psych point of view that things are getting better." AR 443.

Bales saw both Dr. Pesce and Dr. Westbrook on November 12, 2009. AR 455, 511. Dr. Pesce wrote that although Bales was doing "fairly well[,]" he was still having a lot of problems with back pain. AR 455. Bales told Dr. Westbrook that sitting exacerbated his pain and that his pain had increased over the past month. AR 511. Dr. Westbrook recommended that Bales exercise daily for strengthening and conditioning of his lower back and increased Bales's Kadian dosage. AR 511.

Dr. Frederick Entwistle, a non-examining state agency physician, completed a physical residual functional capacity (RFC) assessment form on Bales on November 16, 2009. AR 445-52. Dr. Entwistle found that Bales could lift twenty pounds occasionally and ten pounds frequently and could stand and/or walk with normal breaks for about six hours or sit for approximately six hours in an eight-hour workday. AR 446. Although Dr. Entwistle found that Bales could frequently climb stairs and balance, he determined that Bales could only occasionally stoop, kneel, crouch, and crawl. AR 447. In support of his conclusions, Dr. Entwistle cited,

16

among other things, Dr. Seljeskog's finding in July 2007 that Bales had five out of five muscle strength in his lower extremities and was already lifting fifteen to twenty pounds, Dr. Pesce's notes from a February 2008 appointment that Bales seemed "to be doing well[,]" Dr. Blow's conclusion that the FCE revealed that Bales could work in a light duty capacity, Dr. Westbrook's recommendation in June 2008 that Bales exercise to strengthen and condition his lower back, and Bales's statement in his function report that he could complete his personal care, prepare his own meals, drive a car, and shop. AR 446-47.

In early 2010, Bales's friends and family submitted third-party reports to the Social Security Administration. Bales's mother Sandra Bales stated in her report that Bales was in constant pain, had memory problems, and spent three to four days a week in bed. AR 241. Todd Peters, who identified himself as Bales's friend and roommate, submitted a third-party report stating that Bales was no longer able to sit or stand for extended periods and that Bales lacked the desire to complete simple tasks such as eating, getting out of bed, and maintaining personal hygiene. AR 239. Peters wrote that he had been helping Bales with daily activities like keeping up with appointments and personal business. AR 239. Peters also submitted a third-party function report in which he stated that Bales had trouble with sleep and concentration, had numerous physical limitations, and needed help cleaning his room and doing laundry. AR 253-58, 260. Finally, Michael Koch, Bales's employer at the boat dealership, wrote a letter stating that when Bales returned to work after injuring his back he was dependent on medication and had to be let go in January 2008 because he was unable to fulfill the physical and mental requirements of the job. AR 286.

17

On January 7, 2010, Dr. Westbrook sent a letter to Bales's disability insurance case manager stating that Bales was "not able to be gainfully employed and perform activities in a competitive work situation[.]" AR 397. Dr. Westbrook explained that this meant that Bales was "limited in his ability to perform activities 40 hours a week, 50 weeks a year." AR 397. She concluded that "[a]t the present time, the patient is totally disabled from any and all occupations[.]" AR 397. In a February 2010 letter, Ostrander stated that, based on Dr. Westbrook's opinion, he believed his previous conclusion that Bales was unable to be employed on a regular consistent basis remained correct. AR 284.

When Bales saw Dr. Westbrook on February 11, 2010, he reported back pain that radiated down both legs. AR 467. An MRI performed that day was consistent with advanced lumbar degenerative disk disease, fibrofatty end plate changes at L4-L5 and L5-S1, and left posterolateral disk protrusion at L4-L5 with marked narrowing of the left lateral recess and possible abutment of the L5 nerve root. AR 467. The MRI did not show any subluxation or fracture, and was negative for central canal stenosis. AR 467. Dr. Westbrook did not find any significant changes from Bales's previous MRI. AR 467. Dr. Westbrook noted that Bales was using Kadian and a sleep medication at bedtime for pain control and that in combination, these medications were working well. AR 467. She recommended that Bales exercise regularly for strengthening and conditioning and continue taking his medications. AR 467.

At a medication check with Dr. Pesce on February 16, 2010, Bales reported feeling extremely depressed, having trouble sleeping, and not getting much relief from treatment with Dr. Westbrook. AR 457. He also explained that his claim for Social Security Disability Insurance had been denied and asked for Dr. Pesce's support. AR 457. Dr. Pesce stated: "I have

18

known this patient for quite a few years, and he has always been very functional. So I am pretty sure that he is not malingering and that he is experiencing severe disability." AR 457.

Bales saw Dr. Westbrook again on March 11, 2010. AR 468. Dr. Westbrook wrote that despite undergoing therapy and surgery, Bales still had "lower back pain radiating down the leg and this has prevented [Bales] from being gainfully employed." AR 468. She noted, however, that Bales exercised regularly for strengthening and conditioning. AR 468. Bales saw Dr. Pesce for a medication recheck later that month. AR 481. Dr. Pesce remarked in his notes that Bales seemed more relaxed and like he was "handling things well." AR 481.

Dr. Jerry Buchkoski, a non-examining state agency physician, reviewed Bales's medical records on March 27, 2010. AR 461. Dr. Buchkoski opined that the "main issue impacting [Bales's] functioning is his physical pain. Depression is secondary to pain and is exacerbated when the pain is worse." AR 461. He further noted that "all psychiatric notes indicated that [Bales] was doing well, except for the most recent one when the issue of disability and denial of benefits was specifically addressed. It appears that this note may have been written to address [Bales's] concerns and may not completely reflect [Bales's] emotional functioning." AR 461. Because Bales's pain caused his functional limitations, Dr. Buchkoski agreed with Dr. Soule's conclusion that Bales's psychiatric concerns were not severe. AR 461.

Dr. Kevin Whittle, a non-examining state agency physician, reviewed Bales's medical records on April 3, 2010. AR 465. Dr. Whittle noted Bales's FCE and that after his most recent surgery, Bales showed no neurologic deficits and had five out of five muscle strength in his lower extremities. AR 465. Dr. Whittle concluded that a light RFC with some postural

limitations was appropriate for a patient with chronic back pain and was consistent with the objective findings. Accordingly, he affirmed Dr. Entwistle's assessment. AR 465.

Bales continued to see Dr. Westbrook and Dr. Pesce in 2010 and 2011. AR 469, 475, 477, 479, 497, 498, 499, 500, 502, 503, 504, 507, 508. As at earlier appointments, Bales reported low back pain that radiated to his legs, and Dr. Westbrook recommended that Bales exercise regularly for strengthening and conditioning and continue taking Kadian. AR 469, 498, 500, 501, 502, 503, 507. In her notes from a May 2010 appointment with Bales, Dr. Westbrook wrote that Kadian allowed Bales "to attend to his activities of daily living as long as he paces his activities." AR 504. During his appointments with Dr. Pesce, Bales described financial difficulties and trouble paying for his medications. AR 477, 479. At his last visit to Dr. Pesce in March 2011, Bales reported that he had decreased his Effexor and that things were "much better" since he began a new relationship. AR 475. Bales also described being able to manage his pain "much better[,]" and Dr. Pesce noted that Bales was walking better and not limping. AR 475. Dr. Pesce wrote that "it seems that things have improved dramatically and it is mostly changes in [Bales's] emotional condition since he started this new relationship." AR 475.

Bales transferred his care to Falls Community Health in Sioux Falls, South Dakota after he relocated. AR 515. Bales's first appointment was in December 2011 when he saw Dr. Jon Engbers. AR 515. Bales reported that he had stopped taking all medications in March 2011 because he could no longer afford them. AR 515. He stated that he was currently limited to doing some work around the house and that while he occasionally tried to get groceries or run errands, doing so caused him a lot of pain. AR 515. On examination, Bales exhibited limited flexion and extension of the lumbar spine, tenderness over L4-L5, and a positive bilateral straight

20

leg raise with pain symptoms reproduced at forty-five degrees. AR 516. Bales also showed an abnormal walk with slow speed, although he was able to toe-and-heel walk and squat with the support of a hand. AR 516. Dr. Engbers did not detect any symptoms of anxiety or depression. AR 515. Bales saw Dr. Engbers again in April 2012, when he reported back pain severe enough to prevent him from leaving his house on at least four days of each week. AR 513. Bales also described doing light house work as tolerated and having leg cramps. AR 513.

Bales's hearing before the ALJ occurred on October 19, 2011. AR 37. Present at the hearing were Bales, his attorney Thomas Johnson, and his fiancee Carol Vanmervin (Vanmervin). AR 39. Vocational expert Dr. William Tucker appeared by telephone. AR 39.

Bales testified that he had returned to work almost full time after his second back surgery but that he had relied heavily on hydrocodone to do so. AR 53. He described having memory problems at the boat dealership and testified that he created more work for his employer by misplacing things and putting titles in the wrong files. AR 56. When he could no longer tolerate the pain, Bales returned to Dr. Seljeskog in May 2007 for a third back surgery. AR 53. Bales testified that Dr. Seljeskog told him after his third surgery that pain management was his only option. AR 54.

When asked to describe his typical day, Bales testified that he "may" water plants, cut the grass for a "little while" using a riding lawnmower, change light bulbs, and dust. AR 57. He stated that if he performed any activity for longer than forty minutes, he experienced pain so severe that he could hardly do anything for the next three days. AR 57. Bales estimated that he could sit for approximately one hour and stand for about forty minutes. AR 57-58. He said that his pain made it difficult to maintain any position, whether sitting, standing, or laying down, for

21

an extended period. AR 55. Although Bales had been taking morphine, he testified that he was only taking ibuprofen now because he could no longer afford pain management or the $750 a month his medications cost. AR 56.

Vanmervin, who lived with Bales, testified that Bales cooked, washed dishes, and did some yard work but that he was "miserable" if he pushed himself too far. AR 58-60. She explained that Bales occasionally had trouble rising from a prone position and that there were times when he spent the entire day in bed. AR 59.

The ALJ also heard testimony from Dr. Tucker, the vocational expert. AR 61. Dr. Tucker had completed a past relevant work summary in which he classified Bales's job as a sales representative as "light" and "skilled." AR 281. The ALJ asked Dr. Tucker to assume a person who could work at a light level; could pick up twenty pounds occasionally and ten pounds or less frequently; could sit six hours in an eight-hour work day; could stand and walk combined with normal breaks for six hours in an eight-hour work day; had no limits reaching and no postural manipulation limits; had no visual limits with glasses and no communications limits; and who had to avoid concentrated exposure to hazards such as unprotected heights and fast or dangerous machines. AR 62. The ALJ asked Dr. Tucker to further assume that the hypothetical person was "afflicted with pain and discomfort from a variety of sources that would produce mild to moderate chronic pain and discomfort likely noticeable at all times, however, with appropriate medication, [the person] could be active within these physical limits." AR 62.

Dr. Tucker testified that such a person would be able to return to Bales's past work as a sales representative, which was "light" work both as Bales performed it and as it was performed in the national economy. AR 62. The ALJ then altered the hypothetical, asking Dr. Tucker to

assume that the person's pain and medication placed moderate limitations on his concentration, persistence, and pace, in particular his ability to carry out details, maintain extended concentration, and adapt to changes in a work routine or setting. AR 63. The ALJ defined "moderate" as "noticeably affected, but not precluded[.]" AR 63. Dr. Tucker testified that although such a person could not perform Bales's past jobs and would be unable to work at the skilled or semi-skilled level, the person could perform the unskilled work of an inspector and hand packager, and mail clerk. AR 63-64.

## III.    The Disability Determination and the Five-Step Procedure

At the outset of his decision, the ALJ found that Bales met the insured status requirements of the Social Security Act through March 31, 2013. AR 17, 19. To receive disability insurance benefits, a claimant must establish that he was insured under the Social Security Act when he was disabled. Hinchey v. Shalala, 29 F.3d 428, 431 (8th Cir. 1994). Thus, Bales needed to show that he was disabled on or before March 31, 2013. Id.

The ALJ applied the five-step sequential evaluation process mandated under 20 C.F.R. § 404.1520(a)(4) to determine whether Bales was disabled. Under this five-step analysis, an ALJ is required to examine:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;"
> (2) whether the claimant has a severe impairment–one that significantly limits the claimant's physical or mental ability to perform basic work activities;
> (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience);
> (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and

> (5) if the claimant cannot perform the past work, the burden shifts
> to the Commissioner to prove that there are other jobs in the
> national economy that the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998) (footnote omitted). If the ALJ can make

a conclusive disability determination before step five, the applicable regulation requires the ALJ

to make that determination and not proceed to the next step. 20 C.F.R. § 404.1520(a)(4). If the

ALJ cannot make such a determination before step five, the ALJ must evaluate each step. Id.

Between steps three and four, the ALJ assesses the claimant's RFC. Id.

At step one, the ALJ determined that Bales had not engaged in substantial gainful activity

since January 20, 2008, his alleged onset date. AR 19. At step two, the ALJ found that Bales

had the following severe impairments: degenerative disc disease of the lumbar spine, status post

multiple surgeries, and major depressive disorder. AR 19. The ALJ concluded at step three that

Bales's impairments, either individually or in combination, did not meet or medically equal one

of the listed impairments. AR 19-22.

After reviewing the evidence, the ALJ then calculated Bales's RFC, determining that

Bales could perform light work with certain limitations. AR 22-28. In so concluding, the ALJ

stated that he gave great weight to Bales's FCE, AR 25, great weight to Dr. Entwistle's

assessment, AR 27, and little weight to Dr. Westbrook's opinion that Bales was incapable of

working, AR 26. The ALJ then proceeded to step four, finding that Bales could not perform his

past relevant work as a retail store manager or sales representative because the mental demand

of these positions exceeded Bales's RFC. AR 29. At step five, however, the ALJ found that

Bales could perform other jobs that exist in significant numbers in the national economy,

including an inspector and hand packager and a mail clerk. AR 30. The ALJ therefore found

that Bales was not disabled under the Social Security Act. AR 30.

## IV.   Standard of Review

When considering an ALJ's denial of Social Security benefits, a district court must

determine whether the ALJ's decision "complies with the relevant legal requirements and is

supported by substantial evidence in the record as a whole." Pate-Fires v. Astrue, 564 F.3d 935,

942 (8th Cir. 2009) (quoting Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial

evidence on the record as a whole" entails "a more scrutinizing analysis" than "substantial

evidence[,]" which is "merely such relevant evidence that a reasonable mind might accept as

adequate to support a conclusion." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998) (citations

and internal marks omitted) (noting that it is not sufficient for the district court to simply say

there exists substantial evidence supporting the Commissioner).   "The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence is 'less than a preponderance, but

is enough that a reasonable mind would find it adequate to support the Commissioner's

conclusion.'" Pate-Fires, 564 F.3d at 942 (quoting Maresh v. Barnhart, 438 F.3d 897, 898 (8th

Cir. 2006). "Substantial evidence means more than a mere scintilla." Slusser v. Astrue, 557

F.3d 923, 925 (8th Cir. 2009) (citing Neal v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005)). A

district court "must consider both evidence that supports and evidence that detracts from the

Commissioner's decision." Pate-Fires, 564 F.3d at 942 (quoting Nicola v. Astrue, 480 F.3d 885,

886 (8th Cir. 2007)). Additionally, "[a]s long as substantial evidence in the record supports the

Commissioner's decision, [the court] may not reverse it because substantial evidence exists in

the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (internal citation omitted).

A district court also reviews the Commissioner's decision to determine if appropriate legal standards were applied. See Roberson v. Astrue, 481 F.3d 1020, 1022 (8th Cir. 2007). The district court reviews de novo the ALJ's ruling for any legal errors. Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011); Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

When Bales sought review by the Appeals Council, he submitted new evidence. AR 1-6, 505-60. The Appeals Council stated that it "considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council[,]" but that it "found that this information does not provide a basis for changing the [ALJ's] decision." AR 1-2. The Order of Appeals Council listed and made several exhibits part of the record, including additional medical records, the FCE, and reports and correspondence from Ostrander. AR 5. When, as here, the Appeals Council considers new evidence but denies review, a district court "must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007).[13] In effect, this requires that courts engage in the "peculiar task" of deciding "how the

---

[13]In Nelson v. Sullivan, 966 F.2d 363 (8th Cir. 1992), the Eighth Circuit explained the effect of new evidence submitted to the Appeals Council:

> If the Appeals Council does not consider the new evidence, a reviewing court may remand the case to the Appeals Council if the evidence is new and material. If, as here, the Appeals Council considers the new evidence but declines to review the case, we review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision.

ALJ would have weighed the new evidence had it existed at the initial hearing." Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000) (citation omitted). "Critically, however, this court may not reverse the decision of the ALJ merely because substantial evidence may allow for a contrary decision." Id.

## V.    Discussion

Bales argues that the ALJ's decision is not supported by substantial evidence on the record as a whole and free of legal error. He raises two issues on appeal:

> I. Whether the Commissioner's determination of [Bales's] residual functional capacity is supported by substantial evidence on the record as a whole?
> II. Whether the Commissioner erred in evaluating the opinions of [Bales's] treating pain specialist?

Doc. 12 at 1.

### A.    Residual Functional Capacity

A claimant's RFC "is defined as the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting Leckenby v. Astrue, 487 F.3d 626, 631, n.5 (8th Cir. 2007)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the

---

Id. at 366 (internal citations omitted). Several courts within the Eighth Circuit have found that statements from the Appeals Council similar to the one given in this case establish that the Appeals Council considered newly submitted evidence. See Strobbe v. Astrue, Civil No. 11-1086-CV-W-NKL-SSA, 2012 WL 2921849, at *3 (W.D. Mo. July 17, 2012); Marshall v. Astrue, No. 11-5007, 2012 WL 527910, at *2, 9 (W.D. Ark. Feb. 16, 2012); Tarwater v. Astrue, No. 4:10CV 1974 LMB, 2012 WL 381783, at *17 (E.D. Mo. Feb. 6, 2012); Hill v. Astrue, Civil No. 10-4170 (PJS/FLN), 2011 WL 5878356, at * 9-10 (D. Minn. Nov. 7, 2011). Further, the Eighth Circuit appears to have found similar statements by the Appeals Council sufficient to establish that the Appeals Council considered newly submitted evidence. Perks v. Astrue, 687 F.3d 1086, 1093-94 (8th Cir. 2012). Here, both Bales and the Commissioner agree that the Appeals Council considered the new evidence, so this Court must consider the new evidence as well. Doc. 12 at 21, n.4; Doc. 18 at 6, n.1.

claimant's ability to function in the workplace." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). "The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).

The ALJ determined that Bales had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) within the following parameters: Bales could occasionally lift up to twenty pounds and frequently lift ten pounds or less; could stand and/or walk with normal breaks or sit with normal breaks for a total of six hours in an eight-hour workday; had to avoid concentrated exposure to hazards such as unprotected heights and fast or dangerous moving machinery; would experience "pain and discomfort from a variety of sources that would produce mild to moderate chronic pain and discomfort likely noticeable at all times, but with appropriate medication [Bales] could be active within the physical limits described herein[;]" would have moderate mental limitations—meaning noticeably affected but not precluded—in the ability to maintain concentration, persistence, or pace, "[i]n particular, [Bales] would be moderately limited in the ability to carry out details, maintain extended concentration, and adapt to changes in a work routine or work setting." AR 22.

Bales argues first that the ALJ's reliance on the FCE when determining his RFC was mistaken because the FCE itself conflicts with the ALJ's determination that he can perform light work. The Commissioner disagrees, contending that the ALJ gave great weight to Dr. Blow's opinion rather than the FCE and that the opinions of Dr. Blow, Dr. Entwistle, and Dr. Whittle support the RFC determination.

28

When the ALJ issued his opinion, neither the FCE nor the attached letter from PT Johnson to Dr. Blow were part of the administrative record. AR 5. Nevertheless, and contrary to the Commissioner's suggestion, the ALJ still relied on the FCE. Specifically, the ALJ stated:

> At an appointment on January 15, 2008, . . . Dr. Blow noted that the claimant had recently participated in a functional capacity evaluation, and that this evaluation revealed the claimant could work at light duty. Dr. Blow wrote that the claimant was found to be able to lift 20 pounds occasionally, leg lift 25 pounds infrequently, shoulder lift 15 pounds occasionally-to-infrequently, walking push/pull 25 pounds occasionally, and standing push/pull 35-55 pounds occasionally. Also indicated was the ability to constantly sit, frequently stand, frequently walk, occasionally overhead reach. Dr. Blow released the claimant to work within the guidelines of this assessment. The results of this evaluation were given great weight by the undersigned. The conclusions contained therein were adopted by Dr. Blow, who has a lengthy treating relationship with the claimant. Additionally, the results of this evaluation are generally consistent with the record as a whole, including Dr. Blow's observations at both this appointment and future appointments.

AR 25 (internal citations omitted).

In her letter to Dr. Blow, PT Johnson stated that the FCE indicated that Bales was "able to work at the LIGHT Physical Demand Level for an 8-hour day according to the Dictionary of Occupational Titles, U.S. Department of Labor, 1991." AR 519. Dr. Blow relied on PT Johnson's letter in his notes in concluding that the FCE revealed that Bales was "able to work in a light duty capacity" without defining the term "light duty." AR 328. Despite these characterizations of the FCE by PT Johnson and Dr. Blow, the actual results of the FCE cast doubt on whether Bales is able to perform "light work" as defined in either the Dictionary of Occupational Titles (DOT) or 20 C.F.R. § 404.1567(b). "Light work" and the other terms for exertional levels as used in the Social Security Regulations have the same meaning as in the

29

DOT. See 20 C.F.R. § 404.1567. The Social Security Regulations state in relevant part that light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Id. § 404.1567(b). Similarly, the DOT defines light work as "[e]xerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects." Dictionary of Occupational Titles app. C (4th ed. 1991), available at 1991 WL 688702. Here, the FCE report form, if it was completed accurately, indicated that Bales could not lift, carry, or push or pull *any* weight on a frequent basis. AR 521. Thus, the FCE, to which the ALJ assigned great weight in determining Bales's RFC, indicates that Bales does not have the ability to perform light work as defined in § 404.1567(b). In short, either the FCE form was not completed accurately or PT Johnson's conclusion and report to Dr. Blow that Bales could perform light work is not consistent with that term's definition under the Social Security Regulations. There is no evidence in the record for this Court to presume that the FCE report was completed inaccurately as this incongruity was not capable of being known and explored by the ALJ, who did not have the FCE available to him.

The Commissioner contends that the opinions of Dr. Blow, Dr. Entwistle, and Dr. Whittle still support the RFC determination. But Dr. Blow relied on the FCE and released Bales to work "under the guidelines" of the FCE, AR 330; his opinion therefore does not support the ALJ's determination that Bales could frequently lift ten pounds or less. Both Dr. Entwistle and Dr. Whittle relied in part on Dr. Blow's statement that the FCE indicated that Bales could "work in a light duty capacity[,]"AR 328, when determining Bales's RFC. When the RFC form asked Dr. Entwistle to list the facts that supported his determinations concerning Bales's exertional

30

limits, Dr. Entwistle stated, among other things, that Bales "was evaluated by Dr[.] Blow, a rehabilitation physician on 6-24-08. In that report Dr[.] Blow refers to a 'recently done FCE' which 'revealed that patient is able to work in a light duty capacity.'" AR 447. One of the two pieces of evidence that Dr. Whittle relied on when explaining why he agreed with Dr. Entwistle's RFC determination was that an FCE "in the past indicates capacity for light work." AR 465. The reports of Dr. Entwistle and Dr. Whittle suggest that neither saw the FCE report, but instead relied on the characterization of it by Dr. Blow. It is impossible to know whether Dr. Entwistle and Dr. Whittle would have reached the same conclusions had they known that the FCE on which they relied actually undermined their determinations that Bales could perform light work as defined in § 404.1567(b). Further, it is unclear whether Dr. Entwistle and Dr. Whittle erroneously assumed that Dr. Blow's statement that the FCE indicated that Bales could work in a "light duty capacity" meant that Bales could perform light work as defined in § 404.1567(b).

At bottom, the results of the FCE not only undermine the ALJ's determination that Bales could perform light work as defined in § 404.1567(b), but also call into question the opinions of Dr. Entwistle and Dr. Whittle, to which the ALJ assigned great weight. Given these circumstances, this Court cannot conclude that the ALJ's RFC determination is supported by substantial evidence. If the ALJ could have considered the FCE at the time of his decision, he likely would not have found Bales to have the RFC to perform light work without first seeking additional evidence concerning Bales's RFC or at the very least clarifying whether the FCE report was accurate and whether Dr. Entwistle and Dr. Whittle understood that Dr. Blow's reference to "light duty capacity" did not have the same meaning as the definition of "light work" in § 404.1567(b). See Bergmann, 207 F.3d at 1068 (explaining that when Appeals Council

31

considers new evidence, district courts must decide how the ALJ would have weighed new evidence had it been before the ALJ at initial hearing). A remand to the ALJ with instructions to consider the FCE and to further develop the evidence concerning Bales's RFC—which could be done by re-contacting medical sources and by ordering additional consultive examinations—is the appropriate course of action in this case.[14]

Bales argues next that the ALJ's RFC determination failed to incorporate some of the postural limitations identified in Dr. Entwistle's assessment and the FCE. Dr. Entwistle concluded that Bales could only occasionally stoop, kneel, crouch, and crawl. AR 447. Similarly, the FCE indicated that Bales could bend and crawl infrequently and could squat and kneel occasionally.[15] AR 521. Despite giving Dr. Entwistle's assessment and the FCE great weight, the ALJ did not include any postural limitations in the RFC determination. Although the Commissioner argues that the ALJ's failure to include postural limitations in the RFC determination was harmless, it is unnecessary to reach this issue. Because the ALJ will be recalculating Bales's RFC on remand, he will have the opportunity to incorporate any appropriate postural limitations.

---

[14]It is somewhat rare for an FCE performed by a physical therapist to be central to determining a claimant's RFC. See Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (discussing "other medical sources," such as physical therapists, and the weight given to their opinions). Here, however, Dr. Blow appeared to adopt the FCE when he released Bales to work within its guidelines and incorporated his apparent misinterpretation of the FCE in his records which in turn other physicians relied upon for their opinions. Under these circumstances, the FCE performed by a physical therapist has enhanced importance.

[15]Unlike with the FCE's indication that Bales could not lift or carry any weight frequently, Dr. Blow accurately noted the FCE's findings concerning Bales's postural limitations in his notes. AR 328. Thus, the ALJ was aware of these postural limitations at the time he issued his decision.

Bales argues also that the ALJ's determination of the mental portion of his RFC lacked medical support and was inadequately explained. See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (explaining that claimant's RFC must be supported by some medical evidence and that the ALJ may not draw upon his own inferences from medical reports). In the PRT form he completed, Dr. Soule determined that Bales's depression was not severe and that Bales had mild limitations in his activities of daily living, social functioning, and in maintaining concentration, persistence or pace. AR 431-43. Although the ALJ assigned great weight to Dr. Soule's PRT, he did not adopt all of those findings. Rather, the ALJ determined that Bales's depression was severe, AR 19, and that Bales would have moderate mental limitations in maintaining concentration, persistence, or pace, AR 22. "In particular," the ALJ stated, Bales "would be moderately limited in the ability to carry out details, maintain extended concentration, and adapt to changes in a work routine or work setting." AR 22. Other than stating that he found Bales "somewhat more limited" than did Dr. Soule, the ALJ did not explain his rationale for disagreeing with the PRT. AR 28. Nor did the ALJ specifically explain how he determined the severity of Bales's mental limitations. Although the ALJ noted in his review of the medical evidence that Dr. Pesce gave Bales a GAF score that was indicative of moderate symptoms and limitations, it is unclear whether the ALJ relied on the GAF score when determining that Bales had certain moderate mental limitations. AR 27-28. Because the ALJ will be reconsidering his formulation of the RFC on remand, he will have the opportunity to explain more fully his basis for the mental portion of the RFC, address any inconsistencies between it and the PRT, and to seek additional evidence if necessary.

33

Bales next attacks the ALJ's determination that "with appropriate medication[,]" Bales could be active within the physical limits described in the RFC. Bales contends that the ALJ made this finding without citing any medical opinion that such medications would not themselves interfere with his ability to work. Of course, an ALJ is neither required to rely entirely on a doctor's opinion nor limited to a mere choice between the medical opinions of record when formulating a claimant's RFC. See Chapo v. Astrue, 682 F.3d 1285, 1288 (10th Cir. 2012) ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."); Martise, 641 F.3d at 927 ("[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians.") (internal marks and citation omitted). A claimant's RFC is "ultimately an administrative determination reserved to the Commissioner[,]" Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012) (quoting Cox, 495 F.3d at 619-20), and should be based on "all relevant evidence, including medical records[,]" Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001)). Here, the medical records indicate that Bales's medications did not preclude him from working. True, Bales's employer said he was unable to fulfill the mental requirements of the job, AR 286, and Dr. Westbrook agreed with Ostrander's statement that Bales's pain and the side effects from his medication made him unproductive at the boat dealership, AR 506. But Bales's medical records reflect that he frequently told Dr. Westbrook that he had no side effects from his medications other than constipation. AR 400, 404, 468, 486, 497, 499, 500, 501, 502, 507. The ALJ's explanation of the hypothetical to Dr. Tucker—in which he asked Dr. Tucker to assume that the person's pain and medication placed moderate

34

limits on the person's concentration, persistence, and pace—shows that the ALJ took any side effects Bales might have into consideration when formulating the RFC. AR 63. Accordingly, the ALJ's determination that Bales's medications were not an impediment to his RFC is supported by substantial evidence.

Finally, Bales argues that he cannot afford the "appropriate medication" that the ALJ found Bales needed to function within the limits of the RFC. Bales cites Tome v. Schweiker, 724 F.2d 711 (8th Cir. 1984), and contends that the ALJ may not formulate an RFC that depends on a treatment he cannot afford. Tome concerned a Social Security Regulation that barred recovery if a claimant failed to treat a remediable condition without good reason. Id. at 713. The Eighth Circuit determined that "a lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be . . . an independent basis for finding justifiable cause for noncompliance." Id. at 714. The Eighth Circuit also has taken a claimant's financial resources into account when considering whether an ALJ may discount a claimant's subjective complaints of pain because the claimant failed to seek medical treatment. See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004); Brown v. Sullivan, 902 F.2d 1292, 1294-95 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750, n.2 (8th Cir. 1989); Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987). The Eighth Circuit has made clear, however, that a claimant must offer supporting evidence that his failure to seek treatment or follow a prescribed plan was due to the expense. See Harris, 356 F.3d at 930 ("But in evaluating the credibility of [the claimant's] subjective complaints, it was permissible for the ALJ to consider the lack of evidence that [the claimant] had sought out stronger pain treatment available to indigents."); Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir. 2003) (holding that ALJ properly relied on claimant's failure to seek

treatment given lack of evidence that she attempted to obtain treatment and was denied because of insufficient funds or insurance); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (concluding that ALJ appropriately discounted claimant's allegation he could not afford medical care absent evidence he sought and was denied low-cost or free care); Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting financial hardship claim where there was no evidence that claimant sought to obtain low-cost medical treatment or that she had been denied medical care because of her poverty).

Applying these principles to the present case, Bales has offered some evidence of financial hardship. Although it appears that Bales had no trouble affording his treatment from January 2008 to the middle of 2010, he reported to his doctors on several occasions in late 2010 and early 2011 that he was experiencing financial difficulties and having trouble paying for his medications. AR 477, 479, 507, 515. He told Dr. Engbers that he stopped taking his pain medications in March 2011 because he could no longer afford them. AR 515. Bales has not cited to any evidence that he pursued low-cost medication programs or that he was denied medications because he was indigent, however. Further, it appears from his appointments with Dr. Engbers that Bales was smoking in 2011 and 2012, AR 513, 515, which generally militates against a finding that a claimant cannot afford treatment. See Riggins, 177 F.3d at 693 (claimant's continuing to smoke three packs of cigarettes a day inconsistent with claim that he could not afford pain medication); Fox v. Colvin, Civil No. 12-2234, 2014 WL 24149, at *5 (W.D. Ark. Jan. 2, 2014) (finding that claimant's ability to purchase cigarettes undercut claim of inability to afford treatment). In fairness, Bales testified at the hearing that his medications cost him $750 a month, AR 56, although he at one point told Dr. Pesce that his medications cost

him a $100 a month, AR 477, which seems more realistic. Depending on how much Bales smokes, which is unclear from the record, stopping smoking might not make much of a difference in his ability to pay for medication. Under all of the circumstances, nevertheless, Bales has failed to show that the ALJ incorporated a treatment that he cannot afford into the RFC.[16]

### B.     Dr. Westbrook's Opinion

Bales contends that the ALJ's decision to give Dr. Westbrook's opinion little weight was not in accordance with legal standards and was unsupported by substantial evidence. "A treating physician's opinion is generally given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence' in the record." Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). However, a treating physician's opinion "does not automatically control, since the record must be evaluated as a whole." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (citation and internal marks omitted). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by

---

[16]The claimant has the burden of persuasion to prove disability and demonstrate his RFC. Perks, 687 F.3d at 1092. Once an ALJ finds that a claimant cannot perform his past relevant work, however, the burden of production shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. The Eighth Circuit has stated that "while the burden of production at step five shifts to the Commissioner, the ultimate burden of persuasion rests with the claimant. As such, the Commissioner does not have to reestablish [the claimant's] RFC—what [the claimant] proved at step four continues as [the claimant's] RFC at step five. However, the burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given [the claimant's] RFC." Charles v. Barnhart, 375 F.3d 777, 782, n.5 (8th Cir. 2004) (internal citation omitted). Thus, Bales would have the burden to establish that he cannot afford certain medications and thus that his RFC should be determined without consideration of his improved functioning on medications that are unaffordable.

better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." <u>Perkins v. Astrue</u>, 648 F.3d 892, 897-98 (8th Cir. 2011) (citation omitted). "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." <u>Prosch</u>, 201 F.3d at 1013 (quoting 20 C.F.R. § 404.1527(d)(2)). When the ALJ does not give the treating physician's opinion controlling weight, the opinion is weighed considering the factors set forth in 20 C.F.R. § 404.1527(c)(2). <u>See Shontos v. Barnhart</u>, 328 F.3d 418, 426 (8th Cir. 2003). The factors under 20 C.F.R. § 404.1527(c)(2) include: 1) the examining relationship; 2) the treatment relationship, including length of treatment, frequency of examination, and the nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) any other factors brought to the ALJ's attention tending to support or contradict the opinion.

The ALJ acknowledged Dr. Westbrook's treating relationship with Bales and her July 2009 statement that Bales was "'unable to work due to his low back pain'" but gave this statement little weight because it was "not consistent with the findings of [Bales's] other treating providers" and because it was "inconsistent with Dr. Westbrook's notation during the same appointment that [Bales] was 'able to attend to his activities of daily living with minimal interference due to pain.'" AR 26. The ALJ also acknowledged Dr. Westbrook's January 2010 letter stating that Bales was "'not able to be gainfully employed and perform activities in a competitive work situation'" and that Bales was "'totally disabled from any and all occupations.'" AR 26. Once again, the ALJ gave Dr. Westbrook's opinion little weight, this time stating "[s]uch a blanket disqualification from all vocations is not only inconsistent with the objective findings contained within the

record, but also with [Bales's] function capacity evaluation, which indicated an ability to perform light duty work." AR 26. The ALJ further noted that Dr. Westbrook's opinion was "quite conclusory, providing very little explanation of the evidence relied on in forming that opinion, nor what specific limitations would preclude employment. It is also noted that this opinion [is] on an issue reserved to the Commissioner of Social Security (20 CFR 404.1527(e); SSR 96-2p)." AR 26.

When discussing the medical evidence, the ALJ recounted several of Bales's appointments with Dr. Seljeskog, Dr. Blow, and Dr. Pesce. AR 24-27. In June 2007, Dr. Seljeskog released Bales to "light duty work[,]" noting that he moved about "quite readily" and appeared to "be quite comfortable." AR 24, 305. When Bales visited Dr. Seljeskog's clinic in July 2007, it was noted that Bales was already lifting fifteen to twenty pounds and Bales was told that he could increase this as tolerated. AR 25, 304. Bales was also told that he could continue working one to two hours a day and could increase this as tolerated as well. AR 25, 304. When Bales saw Dr. Blow in November 2007, his gait was "guarded" but otherwise normal, he could walk on his heels and toes "with ease[,]" and he had a negative straight leg raise. AR 25, 336. Dr. Blow's notes from a June 2008 appointment with Bales state that Bales's straight leg raise that day was "excellent" and that Bales "held his leg extended for a considerable length of time which was surprising for someone with his degree of low back pain." AR 26, 327. Dr. Blow further noted that Bales demonstrated no pain behavior while doing his exercises that day, that he moved about the room very easily, and that his lumbar flexion was 35 degrees, his extension was better, and his side bending and rotation were good. AR 26, 327. When Bales saw Dr. Pesce in March 2011, Dr. Pesce noted that Bales was able to walk "better[,]" without limping and

with a straight back. AR 27, 475. As noted above, the ALJ also considered Dr. Blow's characterization of the FCE, Dr. Blow's decision to release Bales to work within his understanding of the FCE's guidelines for light work, and Dr. Blow's opinion that an FCE finding of the ability to do light work was still valid despite Dr. Westbrook's concerns and could be used for vocational planning. AR 25-26, 326-330. As discussed above, Bales is correct that the FCE as the form was completed did not support the determination that Bales could do "light work" as defined in 20 C.F.R. § 404.1567(b), but the FCE as completed nevertheless was inconsistent with Dr. Westbrook's opinion that Bales was "totally disabled from any and all occupations[.]" AR 397. Contrary to Bales's assertions, the ALJ's decision to give Dr. Westbrook's opinion little weight because it was conclusory and invaded the province of the Commissioner was proper. As noted above, Dr. Westbrook opined that Bales was "unable to work due to his low back pain[,]" AR 398, that he was "not able to be gainfully employed[,]" and that he was "totally disabled from any and all occupations[,]" AR 397. The determination of disability is reserved to the Commissioner and Dr. Westbrook's opinions were not the sort to which the ALJ was required to give controlling weight. See House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination."); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."). Moreover, as the ALJ noted, Dr. Westbrook provided little explanation of the medical evidence that supported her opinions and failed to identify any

40

particular limitations that would preclude Bales from working. AR 397, 398. As such, Dr.

Westbrook's conclusory opinions provided little insight into the nature and extent of Bales's

ability to function in the workplace and the ALJ was entitled to afford these opinions limited

weight. See Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996) ("A treating physician's opinion

deserves no greater respect than any other physician's opinion when the treating physician's

opinion consists of nothing more than vague, conclusory statements."); Chamberlain v. Shalala,

47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited

if the opinion consists only of conclusory statements."); Rhodes v. Apfel, 40 F. Supp. 2d 1108,

1119 (E.D. Mo. 1999) ("When a physician does not set forth the specific nature of a claimant's

limitations and does not support his finding of disability with objective medical evidence, the

ALJ can accord whatever weight he deems warranted to the physician's statements.").

For the reasons set forth above, this Court finds that the inconsistencies between the

findings of other doctors who saw Bales and of Dr. Westbrook, the conclusory nature of her

opinions, and the fact that her opinions intruded on a decision reserved for the Commissioner

constitute substantial evidence on the record as a whole supporting the ALJ's decision to assign

little weight to Dr. Westbrook's opinions. How much weight to assign Dr. Westbrook's opinion

will be left for the ALJ to consider on remand.[17] The ALJ will have an opportunity, based on

consideration of the FCE and how that impacts the RFC determination and case generally, to

revisit the issue of what weight to give the opinions of Dr. Westbrook.

---

[17]It is unnecessary to consider whether it was appropriate for the ALJ to discount one of Dr.
Westbrook's opinions in part because it was inconsistent with her statement that Bales could perform
his activities of daily living with minimal interference due to pain.

## VI.    Conclusion

Bales requests reversal and remand of the Commissioner's decision with instructions to award benefits, or in the alternative reversal and remand with instructions to further consider his case.    Title 42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner.    Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).    Sentence four of § 405(g) permits a district court to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."    Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011 (internal citation omitted). Here, reversal and remand is warranted not because the evidence of Bales's disability is overwhelming, but because the evidence must be clarified and properly evaluated. Accordingly, "out of our abundant deference to the ALJ," remand under sentence four of § 405(g) for further administrative proceedings is the appropriate course.    Buckner, 213 F.3d at 1011 (internal citation omitted).

For the reasons stated above, it is hereby

ORDERED that the decision of the Commissioner is reversed and this action is remanded to the Social Security Administration for the purpose of reevaluation, consistent with this Opinion and Order.

Dated March 26th, 2014

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

42